**ORDERED.**

Dated: December 22, 2008

_____
**EILEEN W. HOLLOWELL**
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DAVID H. POLSKY and<br>PATRICIA S. POLSKY,<br><br>    Debtors.<br>_____<br>TOM PETERSON, as Trustee to the<br>Thomas M. Peterson Trust,<br><br>    Plaintiff,<br>v.<br><br>DAVID H. POLSKY and<br>PATRICIA S. POLSKY,<br><br>    Defendants. | Chapter 11<br><br>Case No. 4-05-bk-07805-EWH<br><br><br><br><br><br>Adversary No. 4-08-ap-00393-EWH<br><br><br>**MEMORANDUM DECISION** |

## I. INTRODUCTION

The Debtors assert certain counterclaims which arose out of an agreement with a potential investor. Because the claims the Debtors seek to enforce belong to their wholly-owned limited liability company and not to them, those claims, even if valid, cannot be applied to offset claims asserted against the Debtors by the investor's trust. The reasons for the Court's conclusions are explained in the balance of this decision.

## II. **FACTS**

Prepetition, the Debtors were the sole members of a limited liability company, Jarco Automotive ("Jarco"), which operated a car repair business known as Dave Polsky Automotive ("Polsky Automotive") where both Debtors worked. Tom Peterson ("Peterson") took one of his cars to Polsky Automotive for major repairs. He was very satisfied with the work done on his car and thereafter regularly took his cars to Polsky Automotive for service. Over time, Mr. Peterson developed a cordial relationship with the Debtors.

In late 2000, David Polsky approached Peterson about making a $50,000 investment in a second car repair shop to be known as Goodyear of Green Valley ("GOGV"). Debtors planned to operate GOGV through A & J Parts Unlimited ("A&J"), another limited liability company solely owned by the Debtors.

On January 1, 2001, the Debtors, in their individual capacities, and Peterson, in his individual capacity, and A&J, through the Debtors as its members, entered into an agreement ("Investment Agreement") regarding Peterson's proposed investment. The Investment Agreement provided for Peterson to invest $50,000 in A&J dba GOGV. Peterson was to receive an 11.5% return on his investment over ten years to be secured by 2% of A&J's available stock. Peterson was to also receive 2% of the net gross sales of GOGV for a maximum of 10 years ("2% Agreement").[1] A&J also agreed to maintain a $100,000 term life insurance policy of $100,000 on David Polsky.

---

[1] Plaintiff's Trial Exhibit A at E.

2

Also, on January 1, 2001, the Debtors executed a promissory note ("Note 1") for $50,000 at 11.5% in favor of the Thomas M. Peterson Trust ("Peterson Trust"). Peterson is the trustor, trustee and sole beneficiary during his lifetime of the Peterson Trust. Note 1 is secured by a deed of trust ("DOT") on the Debtors' residence. The Peterson Trust is the sole beneficiary of the DOT. A&J was not a party to Note 1. Note 1 does not contain any references to the Investment Agreement. The Debtors used the proceeds of Note 1 to open and operate GOGV.[2]

On December 22, 2002, the Debtors executed a second promissory note to the Peterson Trust ("Note 2") for $25,000 at 11.5% for approximately a four and one-half year term. Note 2 is secured by the DOT and by term life insurance in the amount of $50,000."[3] The Debtors used the proceeds of Note 2 in connection with GOGV's operation.[4]

In 2002, Peterson agreed to purchase a Ford F250 truck ("Truck") for Polsky to use at GOGV ("Ford Agreement"). Peterson financed the purchase of the Truck with a bank. A&J paid all of the expenses related to the Truck. A&J also deposited into Peterson's bank account the monthly payment due on the Truck. No written agreement was executed regarding the Truck. After the Truck was paid off, it was totaled in an accident. Peterson received approximately $18,000 in insurance proceeds ("Insurance Proceeds") for the Truck.

---

[2] No evidence was presented as to whether Debtors used the Note 1 proceeds to make capital investments in A&J or whether they loaned the Note 1 proceeds to A&J.

[3] Note 2 (Trial Exhibit D) does not specify whose life is being insured.

[4] See Note 2.

3

Case 4:08-ap-00393-EWH   Doc 22   Filed 12/22/08   Entered 12/23/08 07:40:39   Desc
Main Document    Page 3 of 9

After the execution of the Investment Agreement and Notes 1 and 2, Peterson and/or the Peterson Trust received regular monthly payments from A&J on Notes 1 and 2, as well as payments on the 2% Agreement. In mid-2006, all payments ceased. At or about the same time, Peterson received the Insurance Proceeds.

### III. PROCEDURAL HISTORY

The Debtors filed a Chapter 13 petition on October 14, 2005. On July 2, 2007, in response to motions to dismiss their case on the grounds that their debts exceeded the eligibility limits for Chapter 13, the Debtors converted their case to a Chapter 11.

On February 19, 2008, Peterson, in his capacity as Trustee of the Peterson Trust, filed a motion for relief from stay ("MRS") so it could enforce its rights under the DOT. The Debtors filed an objection to the MRS, asserting that the DOT was improperly acknowledged and that substantial payments had been made on both Notes 1 and 2 (collectively, the "Notes"). The Debtors further demanded an accounting of how the Peterson Trust had applied payments on the Notes.

Various continued hearings on the MRS followed while the parties tried to reach an agreement and exchanged accountings. On June 8, 2008, substitute counsel for the Debtors filed a brief ("Usury Brief") which asserted that the "Peterson Loan" violated Arizona's usury laws because there was allegedly no consideration for the 2% Agreement and it is not referenced in either of the Notes.

On June 9, 2008, a continued evidentiary hearing on the MRS was held at which the parties agreed to convert the MRS to an adversary proceeding. The MRS was treated as a complaint for declaratory relief regarding the validity and extent of the DOT. The Debtors' objection to the MRS was treated as an answer.

4

On June 19, 2008, the Debtors filed an amended answer ("Amended Answer") and counterclaims ("Counterclaims"). The Amended Answer incorporated the Usury Brief as a supplement to the Debtors' original objection to the MRS. The Counterclaims alleged: (1) lack of consideration, (2) usury, (3) improper acknowledgment of the DOT, (4) a demand for a turnover of the Insurance Proceeds, and (5) that Peterson had violated the stay by refusing to turn over the Insurance Proceeds to the Debtors. On July 22, 2008, the Peterson Trust filed a reply denying all of the Counterclaims. It also asserted that the Court's jurisdiction was limited to the Trust and did not include Peterson individually.

Trial was continued by stipulation from August 21, 2008 to October 21, 2008. In the Joint Pretrial Statement filed by the parties on October 17, 2008, the Debtors abandoned their claim that the DOT had been improperly acknowledged. At the commencement of the trial, counsel for the Peterson Trust announced that the parties had agreed that the service of the Answer and the Counterclaims on the Trust would be treated as proper service on Peterson individually "so that we can go forward with him as a party as well."[5]

### IV. STATEMENT OF JURISDICTION

This Court has jurisdiction over the Debtors and the Peterson Trust pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(B) and (C). Peterson individually has consented to the Court's jurisdiction to decide the Debtors' counterclaims. A&J is not a party and has

---

[5] Transcript of October 17, 2008 Trial, p 16. lns 18, 19.

5

not made an appearance in this adversary proceeding. The Court, therefore, does not have jurisdiction over A&J or its claims.

## V. ISSUES TO BE DECIDED

1. Should payments made under the 2% Agreement be applied to the Notes?

2. Are the Insurance Proceeds property of the Estate which must be turned over to the Debtors?

## VI. DISCUSSION

A. <u>The 2% Agreement Payments Cannot be Applied to the Notes</u>

In order to decide if the 2% Agreement payments can be applied to the Notes, the nature of the legal obligations among the parties must be analyzed. That analysis begins with an examination of the parties to each of the agreements. The parties to the Investment Agreement are Peterson personally, the Debtors and A&J. The parties to the Notes are the Peterson Trust and the Debtors. The parties to the Ford Agreement are Peterson and A&J.

Next, the consideration exchanged among the parties to each of the agreements must be reviewed. The evidence demonstrates the following:

1. Peterson did not make a $50,000 investment ($50,000 Investment") in A&J as required by the Investment Agreement.

2. The Peterson Trust lent the Debtors the amounts recited in the Notes.

3. A&J paid for the Truck.

Peterson's failure to make the $50,000 Investment in A&J makes the Investment Agreement unenforceable because of a lack of consideration. See Rogus v. Lords, 804

6

P.2d 133, 135 (Ariz. Ct. App. 1991) (A contract, to be legally enforceable, must be supported by consideration). Consideration was given, however, by the Peterson Trust to the Debtors when it lent the Debtors the amounts set forth in the Notes. Consideration was given by A&J to Peterson and by Peterson to A&J because A&J paid for the Truck and Peterson permitted A&J to use it for its business purposes.

The Debtors argue that because all of the payments on the Notes were made by A&J "on behalf of the Debtors," that the Court should collapse and combine the obligations and the parties to the Investment Agreement and the Notes into one unified transaction, effectively making Peterson individually and A&J parties to the Notes and making the Peterson Trust a party to the Investment Agreement. The Debtors further argue that the substance of that unified transaction was usurious because the only consideration given by Peterson for the 2% Agreement was arranging for the Peterson Trust to make the loans described in the Notes, but the Notes contain no reference to the 2% Agreement.[6] If the Investment Agreement and the Notes' transactions are treated as one unified transaction and the Court finds that payments on the 2% Agreement violated Arizona's usury laws, then the Debtors argue all payments made on the 2% Agreement should be applied to the Notes.

The Debtors' argument requires a finding that A&J and the Debtors are effectively one and the same. A court can disregard the corporate form if: (1) the individuality that separates the corporation and owners ceases to exist, and

---

[6] The Debtors also argue that Peterson violated Arizona's mortgage broker licensing statutes in arranging for the Peterson Trust to make the loans of the Notes. Since the Court has found that the Investment Agreement is unenforceable, it need not reach that issue.

7

(2) observance of the corporate form would sanction a fraud or promote injustice. <u>Dietel v. Day</u>, 492 P.2d 455, 457 (Ariz. Ct. App. 1972) (citing <u>Employer's Liability Assurance Corp. v. Lunt</u>, 313 P.2d 393, 395 (Ariz. 1957)). But, there was no evidence presented at trial to support such an "alter ego" finding. Furthermore, A&J's assets and liabilities were not listed by the Debtors on their Schedules. The Debtors have not claimed that they are doing business as A&J and they have not included A&J's income and expenses on their Schedules I & J. Even if Peterson and the Peterson Trust can be viewed as the same entity for purposes of applying Arizona's usury laws, that does not mean that A&J and the Debtors can be considered as the same entities for purposes of determining who is legally obligated to pay the Notes. There was no notice given to A&J's creditors that, as a result of this litigation, A&J could become a co-obligor on the Notes or that Debtors claim priority rights as creditors or otherwise, which justifies A&J's payment of the Notes.[7] Accordingly, the Debtors' counterclaim seeking a declaration that all payments made on the 2% Agreement be applied to the Notes must be denied.

B.  <u>The Insurance Proceeds Are Not Property of the Estate</u>

The undisputed testimony was that the Ford Agreement was between Peterson and A&J. For the reasons explained above, the Debtors and A&J are distinct entities. Any right to demand turnover of the Insurance Proceeds belongs to A&J, not the Debtors. Accordingly, Peterson's refusal to turn over the Insurance Proceeds did not violate the stay.

---

[7] The propriety of A&J's Note payments "on behalf" of the Debtors cannot be decided in this litigation. This Court lacks jurisdiction over A&J because it is not a party nor has it otherwise appeared in this adversary proceeding or Debtors' administrative bankruptcy case.

8

## VII. CONCLUSION

The Debtors, as A&J's sole members, may assert any claims A&J may have against Peterson, but that does not mean that those claims belong to the Debtors. Accordingly, A&J's claims cannot be used to offset Debtors' separate obligations to the Peterson Trust. Judgment will, therefore, be entered this date against the Debtors on their counterclaims.

DATED AND SIGNED ABOVE.

Notice to be sent through the
Bankruptcy Noticing Center "BNC"
to the following:

David H. Polsky and Patricia S. Polsky
3980 West El Camino Del Cerro
Tucson, AZ  85745

Walter F. Wood
1955 W Grant Rd, Suite 125
Tucson, AZ  85745

Michael W. Baldwin
Law Offices of Michael Baldwin PLC
P.O. Box 35486
Tucson, AZ  85740-5487

Scott D. Gibson
Gibson, Nakamura & Green, PLLC
2329 N Tucson Blvd.
Tucson, AZ  85716